## Commonwealth v. Cromartie

Before Milner and Mawhinney, JJ.

*Albert S. Oliensis*, assistant district attorney, for Commonwealth.

*William Vincent Mullin*, for defendant.

MAWHINNEY, J., January 30, 1953.—We are considering defendant's motions in arrest of judgment and for a new trial following a jury verdict of guilty of murder in the second degree. The only question raised by defendant is whether the Commonwealth's evidence was sufficient to prove that the death of the deceased was caused by blows which were struck by defendant. We need only review the testimony pertinent to the cause of death.

The record in this case indicates a brutal and drunken free-for-all involving the deceased, Willie Abrams, defendant, Willie Cromartie; Paul Crosby, Richard Byrd and Wellington Adams.

On Saturday, December 22, 1951, defendant came by train from Phoenixville, where he works, to Phila-

delphia and visited the apartment of one Oliver Wool-ford at 1315 South Twentieth Street, at about noon. There ensued some drinking and Byrd and Adams came to Woolford's apartment. Subsequently, at about 8 p.m., Adams, Byrd and defendant went next door to Adams' and Byrd's apartment. While these men were in the apartment (single room) the deceased, whom defendant had never before seen or met, came into the room and asked Adams if he could stay there for several days. There followed some drinking and discussion. At about 8:30 Crosby came in and joined the other four men, all of whom, including Crosby, had been drinking. There then ensued an argument be-tween Crosby and Abrams involving the matter as to where each came from and how long they had been in Philadelphia. The argument was interrupted after a while when Crosby went to a State store to get another half gallon of wine. Crosby then returned with the wine at about 9 p.m.; up to this time there was no violence.

After Crosby returned Abrams resumed the argu-ment with him as to the fact that Crosby had recently come from Georgia and didn't "know the score." There ensued a struggle between Crosby and Abrams, and Abrams started pushing Crosby and hit him a couple of times and came at him with a knife. In this scuffle Abrams cut Crosby superficially on the top of the hand. Crosby then struck Abrams with a hatchet on the top of the head once or twice and Abrams fell to the floor or sat down on the bed. Defendant pulled Crosby back and took the hatchet from him and pushed him toward the door to keep him from fighting further. Abrams got up from the bed and Crosby said, "Look out, the man's got a knife." Defendant punched Abrams with his fist on the chin and knocked him down. Defendant then said that they should forget the argument and poured drinks for each of them. Abrams then got up

again, off the bed, with a knife which defendant saw, and defendant picked up the hatchet which was laying on the table and struck Abrams on the left side of the forehead with the hammer part of the hatchet and Abrams sat or fell down on the bed and rubbed his head. This blow did not break the skin or cause bleeding but left a red bruise mark. Then Abrams began to get up again and put his hand in his right-hand pocket and Crosby said, "Look out, he is getting a knife out." Defendant then hit Abrams with a smoothing iron in the chest and on the chin and Abrams again sat or fell down on the bed. Defendant had placed the hatchet back on the table and had resumed pouring wine. Byrd then got up and grabbed the hatchet and defendant grabbed his arm and in trying to wrest the hatchet from him Byrd received a blow on the head which subsequently required 21 stitches. Then defendant took the head out of the hatchet and threw it near the head of the bed and he threw the handle under a wardrobe. Defendant stated that he then left shortly after 10 p.m.; *that when he left the other four men were still there and that the deceased, Abrams, was then standing near the table* and there was no fighting then going on. This statement was uncontradicted by and was actually supported by the Commonwealth's witnesses.

Paul Crosby was not called as a witness but there was read into evidence a statement taken from him on December 31, 1951, in the presence of defendant. In this statement Crosby related facts partially and substantially in accord with the review above. He further stated that he fell asleep and got up about 4 a.m. on Sunday morning; *that the deceased was then sitting on the bed and said to him, "I'm going to get you all".* Crosby said he left and got home at 4:30 a.m.; *that when he left Byrd and Adams were there but he did not see defendant there.* Crosby stated that at 8

a.m. that morning Adams came and told him that Abrams was dead and that he and Byrd had taken him out of the room and put him at the stairway leading to third floor.

On December 31, 1951, defendant also gave a statement to the police which was read into evidence. This statement was substantially in accord with the account set forth above and with defendant's oral testimony at the trial.

Wellington Adams testified that Cromartie, Crosby and Abrams were fighting with their fists; that he did not see a hatchet or smoothing iron used; that he drank some wine and fell asleep while the men were still fighting because he couldn't stop them. He stated that he woke up at 6 a.m. the next morning; that only he and Byrd were there and that the deceased was not there, and that he then opened the door and found Abrams lying at the stairway. He then reported the matter to the police. On cross-examination Adams stated that Abrams lived on the third floor of the building and that he knew him about 10 years; that he didn't know when defendant left.

Richard Byrd testified that Crosby and Abrams were arguing and pushing each other around; that Crosby got angry, hit Abrams and then saw a hatchet under the bed and grabbed it and started hitting Abrams in the head; that Abrams punched Crosby. He then dozed off and when he woke up "all of them was fighting." He stated that he was hit by defendant who was his friend and who told him he was sorry. In response to leading questions the witness stated that he saw defendant hit the deceased 3 or 4 times; that he did not see the flatiron used and didn't remember anything else. The witness first told the police that he was injured when he was robbed at Twelfth and South Streets.

Detective O'Mahoney testified that the police found the deceased at the bottom of the stairs on the second floor; that they examined the room where these events transpired; that "there was blood all over the bed and floor and on the walls and ceiling"; that "the cotton batting was torn from the mattress" and "there was broken glass on the floor." There was a knife under the body of the deceased in the hallway. The police on December 31st, after defendant told them about the flatiron, made a search of the room and found it in a hole in about the center of the mattress. There was cotton batting or lint from the mattress on the deceased's face and shoulder where he was found and some of this material was also adhering to the flatiron which was covered with blood.

Dr. William S. Wadsworth, the coroner's physician, testified that he performed an autopsy on the deceased; that there was "a collection of 18 wounds on the left side of the head and face and neck in which there were lacerations, bruises and fractures of the bones from the area well above the ear and from the nose to the back of the head and under the jaw"; that the whole side of the head was crushed in; that there were holes 2 or 3 inches long in the head through which the skull could be examined; that there were crossing and joining external wounds over an entire comminuted area. There were a series of fractures running from the base of the nose, across the eye area into the occipital region. He described 16 of the 18 wounds as lacerations and couldn't discriminate the fractures into numbers because it was "like a broken piece of glass". He stated that each mark indicated violence applied to the skull; that they were individual marks indicating separate blows.

He stated that some but not all of the wounds could have been inflicted by the head of a hatchet; that the iron applied sideways could have caused the crushing

of the bone and could have produced the effects found. The witness stated that at least five of the external wounds produced fractures; that the other blows may have "simply pushed the mass of stuff in and didn't produce any more fractures." He diagnosed the cause of death as multiple wounds of the head.

On this evidence we are fully satisfied that the Commonwealth's evidence fell far short of proving that this defendant administered blows which actually caused the death of the deceased or even contributed to death. There is no reason in this case to suppose that Dr. Wadsworth exaggerated the picture of the brutal, crushing wounds to the deceased's head, involving at least 18 blows. The evidence at best shows only that defendant struck the deceased once on the chin with his fist and once on the left side of the forehead with a hatchet, once on the chest with a smoothing iron and once on the chin with the iron. Byrd testified that he saw defendant hit the deceased 3 or 4 times but he didn't say with what, nor did he indicate where. The massive and vicious wounds which decedent had are not satisfactorily connected with defendant, nor are they indicated as having occurred at any time prior to defendant's departure from the scene.

A conviction in this case could only be predicated upon sheer conjecture unsupported by any satisfactory evidence that defendant dealt the deceased the continuous blows which crushed in the side of his head. A reading of the testimony indicates a very unsatisfactory detailing of the pertinent events by all witnesses except defendant. Defendant himself testified that when he left at about 10 p.m. the deceased was alive and talking and he is supported in this statement by the evidence of Crosby, introduced by the Commonwealth, wherein Crosby stated that when he left at 4:30 a.m. defendant was not there and the deceased was then sitting on the bed talking. No effort was

made to fix the time of death, assuming that there was someone competent to do so. It would be an invitation to sheer and reckless fantasy to permit the jury, in the absence of *evidence*, to conjecture that defendant subsequently returned and beat the deceased to death.

It was incumbent on the Commonwealth to prove beyond a reasonable doubt that some act of defendant caused death or that death was the natural and probable consequence of an act of defendant. It is not sufficient for the Commonwealth merely to prove that death followed chronologically the infliction of a wound by defendant. It must be fully and satisfactorily proved that that injury directly and proximately contributed to the death. The general rule frequently quoted from 2 Bishop, Criminal Law, sec. 637, (9th ed.) is as follows:

"Whenever a blow is inflicted under circumstances to render the party inflicting it criminally responsible if death follows, he will be deemed guilty of homicide though the person beaten may have died from other causes, or would not have died from this one had not other causes operated with it; provided the blow really contributed either mediately or immediately to the death, in a degree sufficient for the law's notice. In other words, the blow or wound for which the defendant is responsible need not be the sole cause."

Neither counsel for defendant nor the district attorney in their excellent briefs, have referred us to any case controlling the facts of the matter before us. General reference may be made as to the subject of causation to the following: Commonwealth v. Almeida, 362 Pa. 596 (1949); Commonwealth v. Kostan, 349 Pa. 560 (1944); Commonwealth v. Edwards, 318 Pa. 1 (1935); Commonwealth v. Scovern, 292 Pa. 26 (1928); Commonwealth v. Eisenhower, 181 Pa. 470 (1897).

It may be conceded that where death results from the combined several blows of different persons, all of them so participating would be responsible for the homicide. Thus if a person receives blows from two persons, neither series of which would alone have caused death but the combined effect of which is fatal, both would be responsible for the death. However, where one administers nonfatal blows and subsequently another administers fatal blows which would in any event have been alone fatal, the first person is not responsible for the death but is guilty only of a form or degree of assault and battery.

The Commonwealth in its brief suggests that the evidence shows that defendant struck decedent in a vital part of the body with a deadly weapon and that in such circumstances one is presumed to know that his blow is likely to kill and therefore to have intended the death which is the probable and ordinary consequence of such an act. The error in this thesis is in assuming, without adequate evidence, that the blow or blows struck did kill. Paraphrasing from defendant's brief, it is apparent that the Commonwealth's case is a hazy and unsatisfactory picture of a drunken brawl in which blows were struck by various persons at various times and with various weapons. The blows which apparently caused death were struck with a flat-iron on the left side of the decedent's head but there is no evidence as to who so wielded the iron. The evidence is consistent with and actually indicates that the blows were struck after defendant's departure. There is no evidence whatsoever of a killing in the consummation of a common purpose or design.

In a homicide case where the life and liberty of the accused is in balance and where guilt must be established beyond a reasonable doubt, the causal connection between the death of decedent and the unlawful

acts of the accused cannot be supported on mere conjecture and speculation. Evidence which makes it possible for the fact in issue to be as alleged, or which raises a suspicion or surmise of guilt is an insufficient foundation for a conviction. The doctrine of reasonable doubt and the genuine presumption of innocence are not to be subverted by the rule that only those facts and inferences are to be regarded which are in support of the verdict. There being no competent and sufficient evidence to establish an essential element of the crime charged, defendant's request for binding instructions should have been granted and his present motion for judgment on the record must be granted.

*Order*

And now, January 30, 1953, the verdict rendered herein is set aside and defendant's motion for judgment on the record is sustained.