Commonwealth *v.* Edwards, Appellant.

2

Argued January 28, 1935.   Before FRAZER, C. J., SIMP-SON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*Frank A. McGuigan,* with him *John C. Phillips* and *Frank W. McGuigan,* for appellant.

*Thomas M. Lewis,* District Attorney, with him *J. Harold Flannery* and *John H. Dando,* Assistant District Attorneys, for appellee.

OPINION BY MR. CHIEF JUSTICE FRAZER, March 25, 1935:

Robert Allan Edwards was indicted and tried in the Court of Oyer and Terminer of Luzerne County for the murder of Freda McKechnie, a young woman twenty-seven years of age. The jury found him guilty of murder of the first degree and recommended the death penalty. From the sentence entered pursuant to the verdict the present appeal is taken.

We deem it unnecessary to relate in detail the facts surrounding this sordid crime. They are set forth at length in the voluminous record of the case and need not be repeated here. The body of the deceased was found submerged in Harvey's Lake, a small body of water near Wilkes-Barre. A post-mortem examination disclosed no

4

evidence of drowning and revealed no marks of violence except a severe contusion or laceration on the back of the head. The Commonwealth contended that on the night of July 30, 1934, the deceased had gone to Harvey's Lake in the company of appellant to swim, that while they were in the water together appellant without warning struck his companion on the head with a blackjack, and then left her lifeless body under the water of the lake. Appellant's motive was to avoid his promise of marriage to the deceased, who was then pregnant by him, and to secure freedom to continue his attentions to another young woman with whom he was in love and whom he was eager to marry. The Commonwealth's case was supported by a complete statement in the nature of a confession, signed by appellant three days after discovery of the crime, but repudiated by him at the trial on the ground it had been procured through fear of bodily harm. Edwards' story on the witness stand was that he and the young woman had gone swimming together, that after they had been in the water a few minutes and had climbed upon a dock to rest, his companion complained of feeling cold, that as she prepared to enter the water again, she suddenly collapsed and died, and that in the excitement and panic of the occasion, he hit her over the head to make it appear an accident. The jury declined to accept this explanation; his credibility was for them, and there was ample evidence to support their finding.

Counsel have presented eleven assignments of error in support of the motion for new trial refused by the court below. Only three of the exceptions raise substantial questions for our consideration. These are assignment number one, which concerns the alleged disqualification of a juror for prejudice, and assignments eight and eleven which go to the question of the admission in evidence of numerous letters written by appellant to the girl he wished to marry, and the cross-examination of appellant in regard to statements contained therein. Before dis-

cussing these questions we will dispose of the other assignments of error in the order presented.

Assignments two and three complain of portions of the trial judge's charge to the jury. We have examined the passages indicated and find no error. In the one instance, the court referred to defendant's testimony that the young woman with him suddenly died, and pointed out that the doctors who had examined her both before and after death found the heart normal. This instruction was not improper and was no more unfavorable to defendant than the state of the record made necessary. Complaint is also made of the trial judge's expressing his opinion as to the punishment to be inflicted if the jury found defendant guilty. The part of the charge in question reads as follows: "If that statement is true, if the defendant determined to do away with the deceased, to take her life, and pursuant to such intention, carried the blackjack concealed in his bathing suit, and, when the opportunity afforded itself, struck the deceased a blow on the head with the blackjack, intending to kill her or to render her unconscious so she would drown, and his act contributed in any degree to her death, then, in the opinion of the court, the defendant is guilty of murder of the first degree and deserves the maximum penalty. But you are to pass upon the evidence in this case. All questions of fact in it are for you. It is for you, and not for the court, to pass upon the question of defendant's guilt or innocence. And if you determine he is guilty of murder, the duty of fixing the penalty devolves upon you, not upon the court. The court in this case has nothing to do with the question of the defendant's guilt or the fixing of his punishment. You are not to be influenced by any opinion I may have expressed. These matters are entirely for you. And in the event that you find the defendant guilty of murder of the first degree, the fixing of the penalty is your exclusive function."

We can find nothing objectionable in this language. It is entirely in accord with our previous rulings on the sub-

ject. The trial judge is at liberty to express an opinion as to the guilt or innocence of the accused and the penalty to be inflicted, provided he does so in language which will not inflame or arouse the jury, and provided also that he makes it clear that the jury is absolutely free to decide those questions regardless of his opinion: Com. v. Nafus, 303 Pa. 418; Com. v. Stabinsky, 313 Pa. 231. These assignments are overruled.

Assignments numbers four, five, six and seven raise merely formal objections as to abuse of discretion in refusing a new trial, excessiveness of punishment, and the like. A reading of the record is sufficient to show the utter want of merit in these contentions and they are accordingly all dismissed.

Assignments nine and ten relate to the admission in evidence of testimony by Warden Healey of the county jail and Dr. Freeman, the jail physician, concerning conversations had by them with appellant, after his arrest, in which Edwards admitted his guilt. The testimony was objected to on the ground that it was obtained under a promise that any statement made to the warden or the doctor by appellant would not be used against him. Even if this be true, which the Commonwealth denies, as witnesses Healey and Freeman testified they merely told Edwards his statements would not be given publicity, nevertheless the conversations were properly admitted, for the fact that a confession is made under a promise of secrecy is no bar to receiving it in evidence: Com. v. Goodwin, 186 Pa. 218. The confidential relation of doctor and patient did not exist between the jail physician and appellant in such manner as to make the communication privileged: People v. Sliney, 137 N. Y. 570; Norwood v. State, 158 Miss. 550; State v. Dean, 69 Utah 268. Moreover, as pointed out by the court below, "at common law a physician was not disqualified from testifying to information acquired while attending patients in a professional capacity. The Act of June 7, 1907, P. L. 462, which provides that a physician shall not be allowed to testify

to information received by him in a professional capacity, when such information tends to blacken the character of the patient, applies only to civil cases."

The circumstances surrounding the statements made by the prisoner to the warden and the jail physician were carefully explained to the jury. On this point the trial judge charged as follows: "The statements made by the defendant on these occasions were received in evidence not as a confession, but as statements made by him concerning the death of Freda McKechnie, the value of which is for you to determine. The remark as testified to by the warden was not a promise of immunity from prison; defendant was told, not that he would escape punishment or that he would be freed, but that no publicity would be given to the statements. This was a collateral inducement, and in determining the weight to be given to the kind of statements made by defendant, you should give careful consideration to the inducement that led to the making of them, and then judge the value and determine the weight to which such statements are entitled. You should determine whether the warden told him anything he said would not be used against him. This is the defendant's testimony. If you find that the defendant was told by the warden that the statements would not be used against him, then they should be entirely excluded from your consideration." This instruction amply protected defendant's rights and left to the jury the weight to be attached to his statements in view of the circumstances in which they were received.

The assignments of error raising these questions are both overruled.

We come now to a consideration of the admission in evidence of appellant's letters to Margaret Crain, and the district attorney's use of them in cross-examination. These letters (172 in number) were offered by the Commonwealth to substantiate its claim that Edwards murdered the McKechnie girl to be free to marry the girl to whom the letters were written. The purpose was also to

corroborate defendant's written statement concerning his motive for the crime. Counsel for defendant sought and obtained permission to peruse the letters before the court ruled on their admission. They were objected to as being immaterial and irrelevant and as tending to divert the attention of the jury to matters not in issue in the case. The trial judge overruled the objection but stated the letters would be received solely to cast light on the relations between defendant and Miss Crain and, from the Commonwealth's standpoint, to establish motive. We believe this ruling was entirely proper and that the trial judge did restrict the effect of the letters in his charge to the jury, where he said: "The letters from the defendant to Margaret Crain were received in evidence for the purpose of showing the relations between the defendant and Miss Crain. The Commonwealth contends that the defendant's love and affection for Miss Crain was the motive for the slaying of Miss McKechnie. As I have said, the letters were received in evidence to show the relations between the defendant and Miss Crain. They are to be considered for that purpose alone. You are not to be prejudiced against the defendant because of the contents of the letters. Consider them only for the purpose stated—that of indicating or showing the relations between the defendant and Miss Crain."

The letters were clearly admissible for the purpose of showing motive. They manifest an intense and intimate affection for the girl to whom they were written, and a desire on the part of appellant to marry her as soon as his financial condition would permit. They give very real support to the Commonwealth's contention that Edwards murdered the deceased to rid himself of his entangling liaison with the McKechnie girl. Counsel for appellant argue that the admission of the letters was prejudicial to defendant because they besmirched his character and tended to divert the minds of the jurors to collateral matters, particularly offenses of a moral nature. "It certainly does not follow that evidence, otherwise legitimate,

should be excluded only because it tends to exhibit a character not accordant with an honest life": Turner v. Com., 86 Pa. 54, 70. The law is clear that evidence of offenses other than the one for which a defendant is on trial, is admissible if it be shown there is a real connection between the two or if the prior misconduct tends to show the state of mind of the prisoner upon the act of which he is accused: Com. v. Winter, 289 Pa. 284. "The rule on this subject may in substance be stated to be that, where facts and circumstances amount to proof of another crime than that charged, and there is ground to believe that the crime charged grew out of it, or was in any way caused by it, such facts and circumstances may be proved to show the quo animo of the accused": Com. v. Ferrigan, 44 Pa. 386, 387. See also Wigmore on Evidence, second edition, volume 1, page 457, where it is stated that "the fact that a defendant's acts of misconduct would be inadmissible as showing his bad character does not in the slightest stand in the way of receiving the same acts in evidence if they are evidential for other purposes." In the present case appellant's letters indicated his intense and intimate attachment to the Crain girl extending over a prolonged period of time. We believe this fact was obviously material in showing appellant's motive for the crime of which he has been convicted. It is of no moment that the letters contain references to immoral conduct of appellant or that the district attorney emphasized these matters in his cross-examination of appellant. The letters were in evidence and were handed to the jury. Their meaning was clear and nothing was developed in the cross-examination which was not evident on the face of the letters. The responses elicited by the prosecuting attorney's questions were no more prejudicial than the letters themselves. The assignments of error raising these points are likewise dismissed.

There remains for consideration only the assignment charging error in the refusal of defendant's motion for a new trial on the basis of after-discovered evidence that

a juror was disqualified for the reason he had prejudged the guilt and punishment of the accused. The facts are that on October 9, 1934, several days after termination of the trial and return of the jury's verdict, appellant presented to the court below his motion for a new trial in which it was alleged, inter alia, that juror John Luft had prejudged the case and had falsely sworn when examined on his voir dire. Affidavits of three residents of the community in support of the allegations were attached to the petition. The trial judge accordingly fixed October 15, 1934, for a hearing as to the disqualification of the juror. At the time designated a number of witnesses testified concerning statements alleged to have been made by Luft prior to the trial showing bias and prejudice. Testimony was also taken to rebut the charges and the juror in question was thoroughly examined. After consideration of all the evidence produced on this phase of the case, the trial judge concluded that the charges of prejudice had not been substantiated and refused the petition. The decision on this point, resting as it did on conflicting evidence, was manifestly within the discretion of the trial judge, and can only be set aside for plain error. We are confident that had appellant brought forth clear and convincing evidence that juror Luft had formed a firm conviction of defendant's guilt before the trial and was eager to send him to the electric chair, the learned trial judge would have had no hesitation in setting the verdict aside and ordering a retrial. However, the testimony was highly contradictory, and the juror involved was most positive and emphatic in his denial of the charges. The credibility of the witnesses was for the hearing judge who had a far better opportunity to judge of their veracity than we have. In his opinion he carefully reviewed the evidence given by both sides and concludes as follows: "However, no enmity between the juror and the defendant has been shown, nor is it contended that any existed, and no effort on the part of the juror to persuade or influence the other jurors during the

deliberations of the jury is alleged . . . and, after a careful consideration of all the testimony, having due regard for the appearance, manner and demeanor of the various witnesses and the circumstances under which the various conversations with the juror in question are alleged to have occurred, our deliberate judgment is that the accusations made against the juror have not been established, and that although the juror may not have exercised the best possible judgment in talking, or permitting others to talk to him, about the case, he had not prejudged it, but that in reaching a verdict he did just what he said he would do when examined upon his voir dire, viz., decide the case upon the evidence adduced in court and upon nothing else." In the face of this clear statement from the trial judge we would not be warranted in reaching a contrary conclusion upon the evidence before us.

In addition it should be noted that when juror Luft was examined upon his voir dire he was not asked by defense counsel whether he had ever formed or expressed an opinion as to the guilt of the defendant. Luft was well known in the community and particularly well acquainted with defendant's family. He had worked for many years as an employee of the Kingston Coal Company, of which defendant's father had been paymaster for twenty-two years. The latter was in court during the selection of the jury and would certainly have objected to the acceptance of Luft if he had any ground for thinking him to be prejudiced or biased on the case. Despite this fact, the juror was accepted without challenge. The inference is strong that defendant had every reason to believe he would be accorded fair and impartial treatment at the hands of this juror.

We have examined this case with the greatest of care because of our sympathy for appellant's worthy parents and our natural reluctance to affirm the death penalty for a young man only recently come of age and with no previous criminal record. But after reading and re-

reading the testimony, we find the evidence of the prisoner's guilt to be overwhelming. The crime was of a most inhuman and atrocious nature and was utterly devoid of extenuating circumstances.

The judgment of the court below is affirmed and the record is remitted for the purpose of execution.