**UNITED STATES**

v.

**James W. KILLOUGH.**

**Crim. No. 977–60.**

United States District Court
District of Columbia.

May 31, 1963.

David C. Acheson, U. S. Atty., Charles T. Duncan, Asst. U. S. Atty., for the government.

William Bryant, Washington, D. C., for defendant.

CURRAN, District Judge.

Defendant was indicted for first degree murder in the alleged strangling to death of his wife. He was convicted of manslaughter. Upon appeal the conviction was reversed and the case was remanded to the District Court for a new trial. The Court of Appeals divided on the problem. Four of the appellate judges held, as stated in an opinion, 315 F.2d 241, by Judge Fahy:

> "The oral confession obtained in this case at the jail so soon after the

illegally procured and inadmissible confessions must be held inadmissible as the fruit of the latter."

Four other appellate judges were of the contrary view. Judge Wright, the ninth judge, filed a separate opinion in which he stated:

"I agree that it is inadmissible, among other reasons, because it was obtained from the accused before he had an opportunity to obtain counsel, who undoubtedly would have advised him to exercise his right of silence. But I also think that confession was inadmissible because it was tainted by the first confession, admittedly obtained in violation of Rule 5(a), as construed in Mallory."

In respect to this first ground named by Judge Wright (the necessity for counsel), Judge Fahy said:

"* * * nowhere have we said that a post-hearing confession, following one illegally procured before the hearing, must necessarily await the entry of counsel; * * *."

The other four judges, as I have indicated, would admit the confession. Judge Youngdahl, in the trial court, had held that the meeting between the defendant and Lieutenant Daly at the D. C. Jail on October 26th with defendant's consent and without counsel present was not in violation of the Criminal Rules. In the light of the above quoted language of Judge Fahy, this court concludes that this case was not reversed on the ground that the second, post-arraignment confession is inadmissible because it was obtained from the accused after the warning, but before he had an opportunity to retain counsel.

We turn to the other problem. Judge Wright thinks that the second, post-arraignment, confession in this case was inadmissible because it was tainted by the first confession, but he states:

"If the subsequent confession is an independent act, it cannot be the fruit of the wrongdoing which tainted the first confession."

He indicates that a second confession can be independent of the first but takes the position that there is a presumption that one is the fruit of the other, this presumption being, of course, a rebuttable one. He uses the expression "the link can be broken." Further, in his separate opinion, Judge Wright said:

"* * * I would continue to presume involuntary the subsequent confession of an accused from whom one illegal confession has already been extracted."

He expresses the view that a warning under Rule 5(b) does not overcome the presumption, but adds: "But it does not follow that nothing will."

The four dissenting judges were of the opinion that the purpose of Rule 5(a) was fully met and concluded that a fair and impartial administration of justice required that the conviction be affirmed.

The case is now before this court for a new trial but, previous to the trial, the Government requested a hearing on the defendant's motion to suppress a certain written statement made by the defendant which the Government intends to present as evidence. The purpose of this hearing was to ascertain the circumstances under which the statement was taken so that this court can rule as to whether the statement should properly be received in evidence.

The following facts are conceded. The defendant Killough was arrested on Monday, October 24, 1960 at approximately 9:00 a. m. in the 300 block of Jay Street in the District of Columbia. He was taken to the office of the Homicide Squad of the Metropolitan Police Department and was there interrogated intermittently until 10:00 p. m. on the evening of that day, with time out for lunch. He was held overnight in the cellblock at Number One Precinct, no charges having been lodged against him. On the next day, Tuesday, October 25th, the defendant was again interrogated commencing about 9:00 a. m. and continuing some two and one-half hours until about 11:45

a. m. At the latter time the defendant made incriminating oral statements. About an hour later at 12:45 p. m. that same day the defendant began to give a written statement and that statement was concluded and signed at 2:30 p. m. The defendant was arraigned at approximately 3:00 p. m. on Tuesday, October 25th.

It is my understanding that the committing magistrate advised the defendant that he was entitled to retain counsel and that he was not required to make a statement. Defendant at that time not having counsel, the magistrate, with the consent of both sides, adjourned the preliminary hearing from October 25th until November 15th. In the meantime, defendant was committed to the D. C. Jail. There, on the next day, which was Wednesday, October 26th, and before the defendant had retained counsel, the officer who participated in the inadmissible confession the day before, obtained an oral confession which the trial court admitted in evidence.

The foregoing was before the court upon the first trial and before the Court of Appeals. But this court now has before it an additional set of facts, involving another incident, new to the case. A witness testified at the hearing who was neither a police officer nor a member of any law enforcement agency, nor was he investigating crime, and he described this other incident.

At the hearing before this court one John Joseph Hunt, who is a Classification Intern at the D. C. Jail, testified that the defendant had admitted his crime to him in an interview which took place between 8:00 a. m. and 10:00 a. m. on the morning of Wednesday, October 26th. Mr. Hunt is a student at Georgetown University in the History Department where he is working for a Doctor of Philosophy Degree in history. He is twenty-six years of age and the only remuneration he receives for his work in the Jail is board and room and a few incidentals such as laundry, shoeshines, etc. He states that he interviews the inmates at the D. C. Jail for the purpose of mailing and visiting. He also testified that there are two types of interviews, one called the long form, and one the short form. He says the short form is for misdemeanors and the long form for felonies; that the short form is essentially a list of brothers, sisters, father, mother, wife and husband, for the purpose of mailing and visiting, and that the longer form includes this, plus employment record, military record, past prison record, and the inmate's version of the offense for which he is charged; that these interviews are conducted of every felony prisoner who comes to the Jail. He testified that prior to the interview with Killough he had not had any conversation with any member of the Metropolitan Police Department nor any one else connected with the Police Department in connection with the Killough case; that the only facts that he was personally familiar with in the Killough case were derived from accounts in the newspapers; that he did not have any report from any police officer or any other investigative agency; that Killough talked to him willingly and was most cooperative. The Government introduced in evidence at this hearing the long form, which was filled out by the Classification Intern. Part V of the long form relates to the criminological data. Mr. Hunt says that he vaguely recalls saying to Killough that he was charged with murder in the first degree and then said to Killough, "Do you care to tell me about it or make a statement," and Killough said that he would. Defendant was free to state that he did not care to make a statement. Hunt then testified that Killough told him the following:

> "On October 13th, 1960, I suspected that my wife was out seeing another man. I suspected that she did this frequently even with white men. On this particular date she did not come home from work and I went to the house of a friend I knew she knew. I knocked, was admitted by the people, who were scared when they saw me. They of-

fered me a few drinks and to watch the World Series. While there I heard my wife's voice upstairs in the bedroom with another man. I then went out for a couple of drinks with another girl in order to give my wife time to leave. I did not want to embarrass her. When I brought the girl back I saw my wife pull away in her car. I followed her home. When I confronted her at home she ignored me and I lost control of myself and choked her. She died."

Hunt further testified that defendant Killough signed his name under this statement. He also testified that no threats nor promises were made to Killough; that he re-read the statement to Killough before Killough signed it.

Under the criminological data on the "long form" (Government Exhibit No. 1), the witness Hunt made an evaluation in which he stated:

"When interviewed, the inmate was friendly, polite and well mannered. He appeared to be of above average intelligence. He admits guilt of the present offense and had a good attitude towards service of the sentence * * *."

▮▮ At this hearing, out of the presence of the jury, the defendant offered no testimony of any kind or character. This court finds that the circumstances established that this statement to Hunt was freely and voluntarily made. There was no compulsion exercised by Hunt with respect to the statement made to him by Killough. This court must ascertain and follow the view of a majority of the Court of Appeals. I take it that Judge Wright's view of the rebuttable presumption, added to the view expressed by four of the judges, constitutes a workable majority rule for this court to follow. This court applies that view as it understands it. If this statement given Hunt gave rise to a presumption that it was tainted as a result of the previous illegally procured and inadmissible confession, I hold that the Government has rebutted the presumption and the link between the first confession and the statement to the witness Hunt has been broken. This finding arises from the facts. The alleged written statement given to the Classification Intern, who was in no way connected with a law enforcement agency and who was not investigating crime, was voluntary and it was not "the fruit of the wrongdoing." At the hearing before this court there was not a scintilla of evidence of any coercion or other improper inducements. There was no questioning. No police officer was present. The statement to the Classification Intern was independent of the first confession and was made after adequate time for deliberate reflection. It follows from this finding that the defendant's motion to suppress must be denied.

The United States Attorney made the following proffer of proof in reference to the admissibility of the testimony of the Coroner:

"The Government would propose to call Doctor A. Magruder MacDonald, who was then the Coroner for the District of Columbia. Doctor MacDonald will testify that about 12:30 or 1:00 p. m. on Tuesday, October 25th, in response to a telephone call, he went to the Northeast section of Washington, Jay Street extended, beyond Jay Street to the banks of the Anacostia River, and there he found the remains of a human body, maggot infested, attacked by animals, badly decomposed; that at that time he was able to recognize it as the remains of a human body, and that he pronounced the body dead at about 1:15 p. m. on that day.

"The Government will then show, or would propose to show, that one Eugene Compton, who was a morgue attendant, came out to the scene, picked up the remains in the morgue ambulance, and took it back to the morgue.

"The Government would further offer to show that Doctor Richard Whelton, then a Deputy Coroner,

now the Coroner, on the 28th of October performed an autopsy on the body; that due to the advanced state of decomposition he was unable to take a blood sample, nor was he able to determine the cause of death.

"The Government will further offer to show that on the 27th of October one Sterling Hackett, who is an undertaker, licensed undertaker and the director of the Petworth Funeral Home, went to the D. C. Jail, that he was consented to be seen by the defendant Killough, that the defendant Killough executed a so-called mortician's release, the provisions of which are roughly as follows:

'I hereby certify that I am the husband of Goldie Killough, and I authorize the release of her remains to the Petworth Funeral Home.'

"That Mr. Hackett took the release to the morgue and that the body which Doctor MacDonald identified was, in fact, released to Mr. Hackett as the remains of Daisy Killough.

"There will be further testimony, Your Honor, from civilian witnesses, from Doctor Whelton, and from an FBI agent, all relating to the color of the—of Goldie Killough's hair, and the color of the hair of the corpse, and the fact that hair samples taken from the corpse had been bleached, and this is determined by scientific examination, and that the color of the hair, as observed by the FBI agent, by the Deputy Coroner, and by persons who knew her in her lifetime, the color of the hair was all the same.

"The Government will further offer to show, with reference to the identification of the corpse, that in the trunk of Goldie Killough's car certain spots or stains were observed after her disappearance. These spots or stains were ascertained by the identification division of the FBI to be human blood Type 'A'. * * *.

"The difference between the Coroner's testimony in this case and the Coroner's testimony in the former case is that in the former case, in the oral statement which was admitted against the defendant, that being the statement made on the 26th of October to Lieutenant Daly at the jail, the defendant, among other things, testified that he carried the body out to Jay Street extended and had buried it under a sofa or other debris which was out there.

"Dr. MacDonald's testimony in the former case picked up at that point. In other words, he said 'I went out there to where the defendant said he carried the body.'

"In this case there will not be any evidence at all as to where the defendant carried the body. The Coroner's testimony will merely be that on such and such a date he went to this place and there recovered the body.

"In other words, the link between the defendant's inadmissible statement and the Coroner's testimony which was very much present in the former case, is not presented in quite the same way in this case."

▮ The four dissenting judges would admit the evidence of the body, while four judges do not state any position, and Judge Wright would suppress all evidence of the body as "fruit of the poisonous tree." The four dissenting judges and Judge Wright agree that the appellate court should not pass the question of the admissibility of the Coroner's testimony. The four dissenting judges thought this question should be ruled on since it would inevitably arise in a new trial and the District Court should not be left without guidance on this critical issue. This court agrees and has no difficulty whatsoever in reaching the conclusion that such testimony

should be admitted. To say that the evidence concerning the body of the deceased was "fruit of the poisonous tree" is illogical and unrealistic. Furthermore, this court is of the opinion that the Silverthorne-Nardone exclusion rule has no application here. The Coroner's testimony in no way incriminates the defendant for his testimony is merely evidence that there is a dead body and his testimony in no way connects the defendant with the crime. To hold otherwise would be carrying the Suppression Doctrine beyond its intended extreme. This court cannot go that far for to do so would shatter the reasonable balance that is so necessary between the rights of the individual and the rights and protection of society. Law abiding citizens are entitled to the equal protection of the law. We are well aware that some people do commit crimes; that they do not commit them in the presence of law enforcement officials; that it is the duty of these officials to investigate and to detect crimes and to solve them, in order that the perpetrators may be brought to trial and, if found guilty, be convicted. This court is as jealous of the rights of the accused as any one but it must apply the law impartially, unemotionally, and as it is provided by those who have the responsibility for making the law.

The motion to suppress having been denied, and the court having ruled that the testimony of the Coroner is admissible, this case will be set down for trial.