James W. **KILLOUGH**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 17960.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 8, 1964.

Decided June 4, 1964

Mr. William B. Bryant, Washington,. D. C., for appellant.

Mr. Gerald A. Messerman, Asst. U. S. Atty., with whom Messrs. David C. Acheson, U. S. Atty., Charles T. Duncan,. Principal Asst. U. S. Atty., and Frank Q. Nebeker, Asst. U. S. Atty., were on the brief, for appellee.

Before WASHINGTON, DANAHER and WRIGHT, Circuit Judges.

WASHINGTON, Circuit Judge.

In Killough v. United States, 114 U.S. App.D.C. 305, 315 F.2d 241 (1962), a majority of this court *en banc* held that where a police officer procured illegally, in violation of FED.R.CRIM.P. 5(a), inadmissible oral and written confessions from Killough, it was error to admit at the trial Killough's second confession to the same police officer made orally at the District of Columbia Jail because it was "the fruit" of the first confessions. We said, *inter alia*, 114 U.S.App.D.C. at 310, 315 F.2d at 246:

> " * * * the basis for our opinion is that the jail confession was the result of the previous confessions

which were invalidly obtained and concededly inadmissible * * *.

* * * *

" * * * Our opinion excludes only evidence which is due to a violation by the police of their duty under Rule 5(a). Absent such violation and such relationship our opinion precludes no interrogation."

On his second trial held pursuant to our reversal and remand, the appellant was again convicted by a jury of the crime of manslaughter and was sentenced by the District Court to serve a term of five to fifteen years. He appeals, asserting that it was error to put before the jury (1) the incriminating statement he gave to a civilian employee at the District of Columbia Jail, and (2) the evidence provided by certain witnesses, including the Coroner and his staff, relating to a dead body, evidently believed by the jury to be the body of the appellant's former wife, the victim of the manslaughter.

I.

The present case is not concerned with a confession made to the police, to a law-enforcement agent, or to a person investigating crime. The case concerns a statement, not introduced in evidence at the first trial, made by Killough to a university graduate student, working part-time as a "Classification Intern" at the District of Columbia Jail, under the following circumstances:

On October 25, 1960, Killough was brought before a United States Commissioner and charged with first degree murder. Both the Commissioner and the Deputy Clerk at that time advised him [1] that he was not required to make any statement; that any statement he made could be used as evidence against him; that he was entitled to retain counsel and to have a preliminary hearing where he

or his counsel could cross-examine the prosecution's witnesses; and that he was entitled to a continuance in order to obtain counsel. Killough said he was undecided about possible representation by counsel and the proceedings were by consent of both parties continued until a named date, about 20 days away. Pending this hearing, Killough was ordered committed without bail to the D. C. Jail on the charge of first degree murder.[2]

On the morning following his appearance before the U. S. Commissioner, Killough was brought by a Jail officer from the cellblock to the visiting room at the Jail, called the "Rotunda," and was seated at a table with a Classification Intern for an interview. The Intern was 26 years of age and a graduate student at Georgetown University working for the degree of Doctor of Philosophy in history. His duties at the Jail were to interview for 15 hours per week inmates of the Jail. For this he received room and board and a few incidentals such as laundry, shoeshines, etc. Such interviews were routine procedure and were conducted with respect to all inmates. Questions were asked pursuant to an interview form, the first page of which was designed to give information with respect to close relatives or friends of the inmates for purposes of mail and visits. In the case of inmates charged with felonies, further questions were asked with a view to reflecting the inmate's employment, military, and past prison records, and the inmate's version of the offense for which he was charged, if he wished to give it, for purposes of classifying him before trial and placing and treating him after trial. The inmate's answers were recorded on the form by the Intern.

The Intern who interviewed Killough was dressed in civilian clothes and did not identify himself to Killough. He

1. See the facts stated by Judge Youngdahl in United States v. Killough, 193 F.Supp. 905, 908 (D.D.C.1961).

2. Killough spoke with a friend before being taken to the Jail and again on the

next morning, and at one of these meetings, probably at the second one at the Jail, requested the friend to secure an attorney.

had not been instructed to identify himself and it was his practice not to do so unless he were asked. In response to a specific question he stated that he could not remember whether Killough asked about his identity. He had before him the Jail Classification Form for felony cases, and proceeded to ask Killough questions suggested by the form and to record Killough's answers on it. The Intern testified that, when he reached the part relating to the offense with which Killough was charged, he stated to Killough "You're charged with first degree murder. Do you care to tell me about it or make a statement?" Killough replied that he would do so and gave an incriminating account of the manner in which his wife met her death. The Intern wrote Killough's answer down verbatim and read it back to him. Killough signed it. The interrogation form, showing Killough's answer and signature, was received in evidence.

The Intern testified that prior to the interview he had had no report from, or conversation with, the police or anyone else about the Killough case, and that his only information about the case had been derived from newspaper accounts that he had read. The Intern stated further that he made no threats or promises to Killough. He testified that when an inmate declines to sign, his usual practice is to tell the inmate that his statement will not be used against him. He testified further that if he is asked by the inmate at any time whether such a statement will be used against him, he responds that it is confidential and will not be used against him. He could not remember whether he told this to Killough. Killough however did not decline

to sign when asked to do so. The Intern said that Killough answered the questions willingly and cooperatively, although he appeared nervous and disturbed. At one point he stated that his stomach was "getting upset." Other classification interviews were being conducted at other tables in the Rotunda simultaneously.

Following a hearing held pursuant to Killough's motion to suppress the Intern's testimony and the form containing Killough's signed confession, the District Court, in an opinion reported at 218 F.Supp. 339 (1963), ruled that the evidence was admissible.[3] It found that Killough's statement to the Classification Intern was not coerced and was voluntary; that it was independent of Killough's first illegally procured confession to the police, was not the fruit thereof, and was made after adequate time for deliberate reflection. Accordingly, it concluded that our decision in the first *Killough* case did not require exclusion of the evidence as fruit of the poisoned tree.[4] Since we are of the view that the Intern's testimony and the confession are inadmissible for other reasons, we find it unnecessary to review this holding.

II.

■■ Killough had been committed to the care and custody of the Jail. The statement obtained from him was pursuant to routine procedure and the result of questioning designed to provide information for a specific and legitimate purpose related to the Jail's classification and treatment of persons committed to its care. See Section 24–442 of the D.C.Code, set out in pertinent part in the margin.[5] Any inmate who inquired

3. The District Court had only the Intern's testimony before it. Killough himself did not testify as to the circumstances under which the interview was held at the hearing on his motion, held outside the jury's presence, and he did not testify at his trial.

4. Cf. Lyons v. Oklahoma, 322 U.S. 596, 64 S.Ct. 1208, 88 L.Ed. 1481 (1944), upholding the admissibility of a confession made to a prison warden some 12 hours after

an inadmissible first confession to the prosecutor and police officers. The *Lyons* case differs from this, however, in that the warden there questioned Lyons for the purpose of securing a confession to be used against him and so warned Lyons.

5. "The Department of Corrections with the approval of the Commissioners shall have power to promulgate rules and regulations for the government of * * * [penal] institutions and to establish and

was told the identity of the questioner, the purpose of the questioning, and that the inmate's answers would not be used against him. There can be no doubt that an incriminating statement given in reliance upon such a promise by a jail employee performing a proper jail function pursuant to statutory authority would not be admissible.[6] We do not think that an inmate who fails to inquire as to the purpose of the questioning and the confidentiality of the answers can be penalized by having his answers turned over to the prosecutor and used against him. When the Jail promises confidentiality to one inmate intelligent, astute, or composed enough to inquire under questioning about the use to be made of his answers, we think there is an implied pledge of confidentiality as to all inmates subjected to the classification questioning. The purpose underlying the questioning confirms this; it was in-

herently a confidential purpose to enable the Jail best to treat the person committed to its care. The rule of fundamental fairness required by the due process clause in our view does not permit use of the incriminating statements made to the Classification Intern in a criminal prosecution under the circumstances present here.[7]

Indeed, in a somewhat comparable situation, that involving an examination pursuant to 18 U.S.C. § 4244, into the sanity or mental competency of accused to stand trial, Congress has specifically provided that no statement made by the accused in the course of the examination "shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding." The wisdom of and need for such a rule in that situation are obvious, and the rule has been recognized even when a statute does not so provide.[8] Here, although the classifica-

conduct industries farms, and other activities, to classify the inmates, and to provide for their proper treatment, care, rehabilitation, and reformation."

6. See Commonwealth v. Edwards, 318 Pa. 1, 178 A. 20, 23 (1935), approving a jury instruction that if the jury found that the accused was told by the jail warden in whose custody he was that his incriminating statements would not be used against him, the statements made to the warden should be entirely excluded from consideration; State v. Rush, 108 W.Va. 254, 150 S.E. 740 (1929), holding that admissions by the accused with respect to account shortages made to a bank examiner, having statutory authority to examine bank officers, were not admissible when made in reliance on a representation by the examiner that statements could not be used against him in a criminal prosecution. Cf. State v. Foster, 25 N.M. 361, 183 P. 397, 7 A.L.R. 417 (1919); Annot., 7 A.L.R. 419 at 432.

7. In Tyler v. United States, 90 U.S.App. D.C. 2, 193 F.2d 24 (1951), cert. denied 343 U.S. 908, 72 S.Ct. 639, 96 L.Ed. 1326 (1952), the accused was interviewed by the supervisor of classification at the jail, apparently under a somewhat different procedure from that used in this case. At least no question as to the admissibility of incriminating admissions made to the supervisor during the interview was there

raised, and the supervisor's testimony appears not to have shown the practice of promising confidentiality to inmates who inquired, if indeed the practice then existed.

8. See State v. Myers, 220 S.C. 309, 67 S.E. 2d 506, 32 A.L.R.2d 430 (1951), where the court said:
"We do not undertake now to define the limits of such [constitutional] rights except to say that the authorities of that institution [the State Hospital] will not be permitted, over the protest of the accused, to reveal any confession made by him in the course of such [sanity] examination, or any declarations implicating him in the crime charged."
Cf. however, Hall v. State, 209 Ark. 180, 189 S.W.2d 917 (1945), where the statute provided that the doctor making the report to a court of a sanity examination might be called to testify by the court or either party, and the court held that the doctor could testify as to a confession made in the course of the examination. People v. Ditson and Cisneros, 57 Cal.2d 415, 20 Cal.Rptr. 165, 369 P.2d 714 at 732–733 (1962), cert. denied and dismissed as to Cisneros, 371 U.S. 852, 937, 83 S.Ct. 93, 9 L.Ed.2d 88 (1962), involved as to Cisneros a similar statute and holding as to the testimony of court-appointed alienists where the plea was not guilty by reason of insanity. As to Ditson, certiorari was granted and the judgment va-

tion examination of inmates does not take place pursuant to specific authority given by Congress, the Department of Corrections, under the direction and supervision of the District Commissioners, is by Section 24–442 of the D.C.Code given "charge of the management and regulation" of the Washington Jail, including the power "to classify the inmates, and to provide for their proper treatment, care, rehabilitation, and reformation." Incriminating statements obtained from the accused in the exercise of the classification function for purposes of proper treatment and care should not, we think, be admitted as evidence of his guilt, any more than such statements obtained in the course of a mental examination. Not only would it be grossly unfair in the constitutional sense to admit them, but the Jail authorities might well be handicapped in the future in seeking information needed for proper classification, treatment, and care of the inmates.[9]

We hold that the statement obtained from Killough by the D. C. Jail under the routine classification questioning conducted under the procedure followed in this case was not admissible as evidence against him in his trial. His conviction must be reversed and remanded for a new trial. In view of this conclusion, it seems unnecessary to pass upon Killough's contention that the confession was inadmissible because he had not then had the advice of counsel.

### III.

We now proceed to the contention that the District Court erred in admitting evidence offered by the Government relating to the victim's body. On the first appeal of this case this court did not pass on the admissibility of this evidence.[10] We think, however, that the question should now be decided, since the matter of its admissibility appears certain to be raised in the event of another trial on remand.

At the second trial on remand, following a tender of the evidence, the District Court, 218 F.Supp. at 342–344, ruled that the evidence was admissible. It rejected the notion that the evidence as proffered relating to the body was fruit of the first inadmissible confession, stating that the challenged evidence did not in any way connect the defendant with the crime. Judge Danaher and I agree that the evidence was admissible.

The Coroner's testimony before the jury was in substance that on October 25, 1960, he was called to the intersection of Kenilworth Avenue and Jay Street, in the Southeast Section of the District of Columbia, to meet a police captain; that he went with the captain along Jay Street to a spot on the east bank of the Anacostia River, the road there being unimproved; that he there saw the remains of a human body, partially covered with debris; that the body was practically "destroyed" and was between 15 and 20 feet from the road in a "little open space" with "a lot of brush and a lot of trees all around in the immediate vicinity"; that he pronounced the body dead; that in his opinion it had been dead for a period of 10 to 14 days; and that while he was there the body was lifted into a morgue ambulance and taken to the District Morgue, where an autopsy was performed in his presence. The ambulance driver testified that he picked up

cated, 371 U.S. 541, 83 S.Ct. 519, 9 L.Ed. 2d 508 (1963), but later the opinion was withdrawn and the petition dismissed for mootness, 372 U.S. 933, 83 S.Ct. 885, 9 L.Ed.2d 769 (1963).

9. It is of course not our function in this case to pass upon the validity of the classification procedure at the Jail, and we intimate no opinion as to the propriety of any of the questions listed on the questionnaire form here used, or as to

any of the procedures used in this case, including the request to the prisoner for his signature.

10. Judge Fahy's opinion, in which three other judges joined, stated that it was unnecessary to pass upon the admissibility of the evidence; Judge Wright thought that such evidence should be held inadmissible; Judge Burger's dissenting opinion stated that the four dissenting judges would admit evidence as to the body.

a body in the presence of the Coroner at that spot on the named date and transported it to the Morgue. The Deputy Coroner testified that on October 28, 1960, he performed an autopsy on a body in an advanced state of decomposition in the presence of the Coroner who identified the body to him as the body pronounced dead by him as previously described; that he was not able to determine the cause of death or to take a blood sample, but that he did take a sample of head hair from the body, and that the hair had been dyed or bleached to a bright orange-red color. The head hairs were delivered to the FBI.

A licensed undertaker and director of a funeral home testified that on October 26, 1960, he went to the Jail and that Killough there signed in his presence a "release" form, which was put in evidence. The release bearing Killough's signature "authorized and instructed" the funeral home "to take care of and prepare for burial the remains of Goldie Killough." The release further contained a statement that Killough certified that "I am the husband of the above named decedent." The funeral home director stated that he then took the signed release to the District Morgue and a body "at least 80, 85 per cent decomposed" was released to him by the Coroner's office on the next day. The assistant superintendent at the Morgue identified further Morgue records which indicated that the body of Goldie Killough was released to the funeral home on October 28, 1960.

An FBI agent testified that he examined under a microscope the hairs received from the Coroner's office and found that the hairs were Negroid hairs which for the most part had been bleached to a red-yellow-brown color but that the few unbleached areas were dark brown to black. A woman friend of Mrs.

Goldie Killough had previously testified that the hair of Mrs. Killough (a Negro) was naturally dark brown but that she tinted it to a lighter brown with gold highlights. Another woman friend testified that Mrs. Killough bleached her hair to "kind of a reddish brown."

██ It is clear that the evidence of the Coroner and his assistants in no way connected Killough with the body; that connection was established in other ways.[11] The mere fact that the body was discovered at the particular time it was discovered because of Killough's disclosure of its whereabouts in his illegally secured confessions is not determinative. We cannot conclude here, any more than in Wayne v. United States, 115 U.S.App. D.C. 234, 318 F.2d 205, cert. denied, 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86 (1963), that the body would not have been discovered "but for" Killough's confession, having regard to the evidence here. Cf. also People v. Ditson and Cisneros, supra note 8, 369 P.2d at 729–731.

The body was near a road, in an open space, close to a heavily populated area, and was only partially covered by debris. The place was very near the home of Killough's then girl friend (now his second wife), where the police took him into custody. In time the body (or its bones) would have been discovered and would have been identified as that of Mrs. Killough. Friends and relatives had for some time been concerned about Mrs. Killough's unexplained disappearance and had been pressing Killough to explain it to them and to report it. One of them had even called the missing persons bureau. The police had interviewed Killough about the disappearance and had discovered discrepancies, if not untruths, in his story. They had found blood on the mat in the trunk of Mrs. Killough's car and had evidence that the blood type was that of Mrs. Killough.

11. As already indicated Killough had acknowledged that Mrs. Killough was dead by authorizing the funeral home to take her body and prepare it for burial. The condition of the body received by the funeral director from the Morgue was the same as that described by the Coroner and the Deputy Coroner; the FBI agent and two friends of long standing showed that the corpse's hair was similar to that of Mrs. Killough.

We note further that the Government had an additional item of evidence against Killough. A nurse employed at the Jail testified that Killough became an inmate orderly in the hospital unit at the Jail, where he worked with or around her. She said that she had had conversations with him and that sometime after June, 1961, he brought some papers relating to criminal charges against him to her to read; that when he showed her the papers, she asked him what had happened, and that he made certain incriminating statements to her. Killough does not argue to us that the nurse's testimony was inadmissible, although at the trial his counsel indicated without stating his reasons that he "wanted" to object to it. We express no conclusion as to its admissibility here, although we may note that no reason for excluding it is readily apparent.[12]

We are constrained to hold that the admissibility of the evidence discussed in this Part, even including the testimony of the Jail nurse, does not justify affirmance of the conviction, in view of the error discussed earlier. See Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897).

\* \* \*

The case is reversed and remanded for a new trial, if the Government chooses to proceed with one, with directions to exclude the evidence based on the Classification Intern's interview.

So ordered.

J. SKELLY WRIGHT, Circuit Judge (concurring in part and dissenting in part).

I concur in Parts I and II of the court's excellent opinion. For the reasons stated in Part II of my concurrence[1] in the first *Killough* case, 114 U.S.App.D.C. 305, 316, 315 F.2d 241, 252 (1962), I am unable to join in Part III of the court's opinion and respectfully dissent therefrom. To the reasons given in Part II of the court's opinion for the exclusion of the confession made to the Prison Classification Intern, I would add the following: The confession was inadmissible because it was the tainted fruit of the illegally obtained confessions extracted by the police from Killough the day before. Killough v. United States, *supra,* 114 U.S.App.D.C. at 309, 315 F.2d at 245. Without the illegally obtained confessions, it is clear beyond cavil that no admissions of any kind would have been made to the Intern by Killough.

As I said in my prior *Killough* concurrence,[2] the prime reason for excluding confessions obtained in violation of Rule 5(a), F.R.Cr.P., is that illegal detention is so potentially conducive to coercion that any confession procured during that time will be conclusively presumed in-

12. We add, however, that in United States v. Bayer, 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947), a second confession made to an FBI agent six months after the making of an inadmissible first confession was held properly admitted where the accused was not under actual arrest and where he was specifically warned before making the second confession that anything he said might be used against him. Here, when Killough made the statement to the nurse, he had already been convicted of manslaughter at the first trial, and was in jail pursuant to that conviction; at least nine months had passed since he was apprehended; the statement involved was made to a fellow worker, not the police or other investigating agent, and was not immedi-

ately preceded by a warning. The opinions of Judge Fahy and Judge Wright in the first *Killough* case suggest that the *Bayer* case must now be considered in the light of the *Mallory* rule: 114 U.S. App.D.C. at 310, 315, 315 F.2d at 246, 251.

1. Since the first *Killough* case the Supreme Court has held, in Fahy v. Connecticut, 375 U.S. 85, 89, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963), that opinion testimony based on evidence illegally obtained is poisonous fruit under the *Silverthorne* doctrine. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

2. 114 U.S.App.D.C. at 312–316, 315 F.2d at 248–252.

voluntary. There is then a rebuttable presumption that all subsequent confessions are tainted by the continuing influence of coercion. Killough v. United States, *supra,* 114 U.S.App.D.C. at 312–317, 315 F.2d at 248–253 (concurring opinion). The reason for this rule is obvious. A prisoner, finally broken by persistent police interrogation, has, in his own mind at least, already committed himself to the tender mercies of a sentencing court through a plea of guilty. A prisoner whose mechanisms of resistance are subdued by defeat and the apparent futility of further combat is in no position to exercise any rights he may have with respect to further interrogation by Government functionaries, particularly when he does not even know that an illegally abstracted confession is not admissible against him and that the law, in spite of the confession, still offers him protection against further self-incrimination.

This then was the situation which presented itself to Killough when he was interviewed by the Prison Classification Intern. Having already confessed twice within a period of 24 hours, he was ready to confess some more. As far as Killough knew, the Intern may have been another policeman obtaining still another confession. In the less than 24 hours since his last confessions, he had not been released on bail, nor did he have the benefit of counsel who would have told him that his prior confessions, being illegally obtained, were inadmissible in evidence. Under these circumstances it is obvious, to me at least, that to say that the confession to the Intern was unrelated to, not the result of, or not tainted by the immediately prior illegally obtained confessions is pure fantasy.

It seems to me that this court should clearly state that where a confession is illegally obtained in violation of Rule 5 (a), F.R.Cr.P., subsequent confessions, however or by whom abstracted, are likewise inadmissible unless the Government convincingly demonstrates the absence of connection with the prior illegal confession. In presenting this proof, the following considerations, among others, are most important: (1) *Did the defendant have the advice of counsel subsequent to the illegally obtained confession?* (2) What was the time interval between the confessions?[3] (3) Was the defendant admitted to bail during that interval?[4] While, as indicated, these considerations are not exclusive, they certainly provide the primary avenues of inquiry in determining whether the subsequent confession resulted from the illegally obtained one.

Applying these criteria, I would hold that Killough's confession to the Intern resulted directly from the illegally obtained confessions and that, being the fruit of illegal activity of Government functionaries, it must be excluded from his trial. Otherwise "the courts themselves [become accomplices in willful disobedience of law," McNabb v. United States, 318 U.S. 332, 345, 63 S.Ct. 608, 615, 87 L.Ed. 819 (1943).

DANAHER, Circuit Judge (dissenting).

After the Supreme Court's decision in McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608 (1943), this court considered Mitchell v. United States, 78 U.S. App.D.C. 171, 138 F.2d 426 (1943). The sitting division then thought there was no alternative but to apply the *McNabb* "exclusionary" rule, and Mitchell's conviction was reversed. The Government realized how devastating would be the effect upon the administration of justice of any such automatic and sweeping ap-

---

3. Compare United States v. Bayer, 331 U.S. 532, 540–541, 67 S.Ct. 1394, (1947), in which the Court approved the admission of a second confession made six months after the first was illegally obtained.

4. Compare Wong Sun v. United States, 371 U.S. 471, 491, 83 S.Ct. 407, 9 L.Ed. 2d 441 (1963), where the Court approved the admission of a second confession made after the defendant had been admitted to bail, the first confession having been made while he was being illegally detained.

plication of *McNabb,* and accordingly certiorari was sought and was granted.

The Supreme Court reversed, United States v. Mitchell, 322 U.S. 65 (1944), noting at page 68, 64 S.Ct. 896, 88 L.Ed. 1140, three other cases where applications of the *McNabb* doctrine had not been challenged by the Government. Mr. Justice Frankfurter in *Mitchell* undertook to explain the *McNabb* holding. He pointed out, as had *McNabb,* that "[t]he mere fact that a confession was made while in the custody of the police does not render it inadmissible." 322 U.S. at 69, 64 S.Ct. at 897. He emphasized the basis of *McNabb,* saying:

> "*Inexcusable* detention *for the purpose* of *illegally extracting evidence* from an accused, and the successful extraction of such inculpatory statements by continuous questioning for many hours under psychological pressure, were the decisive features in the *McNabb* case which led us to rule that a conviction on such evidence could not stand." 322 U.S. at 67, 64 S.Ct. at 897. (Emphasis added.)

Again in Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957), Mr. Justice Frankfurter explained *McNabb* in terms of Rule 5 and its requirement of "judicial caution," and presentation of the accused before the Commissioner "without unnecessary delay." The Court pointed out that Upshaw v. United States, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100 (1948) had implied no relaxation of the *McNabb* doctrine. *Upshaw* had made clear that the petitioner had been illegally detained for at least thirty hours *"for the very purpose* of securing these challenged confessions." (Emphasis added.) 335 U.S. at 414, 69 S.Ct. at 172.

Against such background, we had no difficulty in regarding as properly excludable Killough's confession *prior* to his presentation before the United States Commissioner on October 25, 1960. Quite otherwise were the circumstances *after* his appearance before the Commissioner. Judge Youngdahl with meticulous care had prepared an opinion which correctly analyzed the problem. Killough v. United States, 193 F.Supp. 905 (D.D.C.1961). Four judges here joined in an opinion, which I prepared, citing pertinent cases which had expounded principles upon which we would have affirmed Killough's conviction. Killough v. United States, 114 U.S.App.D.C. at 324, 315 F.2d at 241 (1962).[1] There had been no duress. Killough knew his rights. Judge Youngdahl had held admissible as voluntary the confession by Killough *after* the preliminary hearing. Judge Youngdahl specifically had found that Killough had been advised that he had the right to refrain from making any statement; that any statement he made could be utilized as evidence in a trial against him; that he was entitled to retain counsel; that he was entitled to a preliminary hearing at which either he or his attorney could cross examine; and that he was entitled to a continuance in order to retain counsel.

Such is the judicial caution which is contemplated by FED.R.CRIM.P. 5. This court had twice said that if an accused shall have received such warning he is thereafter free to talk or not, and if the accused, under such circumstances, voluntarily admits his crime his confession may be received against him. The Supreme Court refused to review our decisions in Goldsmith v. United States and Jackson v. United States.[2] It is certainly so that the mere fact a confession has

---

1. The various opinions in that case recited the facts concerning Killough's appearance before the Commissioner where he was advised of his rights. Detailed, in addition, were the circumstances under which Killough the following day repeated his confession. Four judges held that the reaffirming confession—despite the

Commissioner's intervening hearing—was a result of Killough's earlier confession uttered prior to his appearance before the Commissioner. A fifth judge voted to reverse on grounds separately stated.

2. Goldsmith v. United States, 107 U.S.App. D.C. 305, 277 F.2d 335, cert. denied *sub*

been made to police officers by one in custody is not a bar to its use as evidence. United States v. Carignan, 342 U.S. 36, 45, 72 S.Ct. 97, 96 L.Ed. 48 (1951); United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896 (1944); cf. Wong Sun v. United States, 371 U.S. 471, 491, 83 S.Ct. 407 (1963); Bailey v. United States, 117 U.S.App.D.C. 241, 328 F.2d 542 (1964).

This appellant on October 13, 1960, had strangled his wife because he believed she was interested in other men. He placed her body in the trunk of her own car as he considered ways and means of disposing of the corpse. He finally drove down past the home of his "girl friend," Miss Anna Holmes, and concealed the body in a dump. He then returned to Miss Holmes.

Neighbors and relatives questioned him as to the disappearance of Goldie Killough. Thus prodded, the appellant finally reported her disappearance to the Missing Persons Bureau. Interrogated by police, he purported to supply leads of possible value. As the police checked out the information, they discovered he had lied. They made an appointment for him to report to headquarters to clear up discrepancies. Instead of keeping the appointment, he fled. From Pittsburgh he telephoned to his "girl friend," Miss Holmes, who told him the police had been to her seeking to locate him. Thereafter, returning to the District at her suggestion, he went to the girl friend's home where he told her of events concerning some of which she testified at the first trial. At that time, no living person except Killough and possibly Miss Holmes, knew a single fact concerning the unwitnessed crime, not even where the body was. She telephoned to the detectives who came and picked him up.

On October 24, 1960, he told the officers he was aware of his constitutional rights and would neither affirm nor deny that he had killed his wife. Presented before the United States Commissioner

*nom.* Carter v. United States, 304 U.S. 863, 81 S.Ct. 106, 5 L.Ed.2d 86 (1960); Jackson v. United States, 109 U.S.App.

the following day, the appellant received judicial caution, as noted.

Thereafter on the 25th, Miss Holmes had been at the jail to see Killough and left to secure a lawyer for him. He declined at the jail the proffered services of an attorney whom he knew because he had been counsel to the dead woman. That day an officer came to see Killough about his personal property and to secure clearance that the body might be turned over to an undertaker. Killough signed a form consenting to receive the officer, although obviously, he could have refused to do so. He signed the release for the undertaker. Impulsively, after ten days within which to think about the web of circumstances beginning with the death of his wife choked by his own hands, he told the officer what had happened and how he committed the crime. The judicial warning was still fresh in his mind but he wished to continue talking when the officer arose to leave.

On the 24th before the Commissioner's hearing, he had guided the officers to where he had concealed the body of his victim. One of my colleagues would exclude evidence concerning the corpse on the ground that its discovery directly resulted from police wrongdoing. He has thought of such evidence as the "fruit of the poisonous tree."

When this court divided five to four, the case was returned for a new trial. The Government then called as a witness a jail classification officer to whom Killough—after his appearance before the Commissioner—had related some details of the crime. The witness had no connection with the police. The situation was not unlike that in Tyler v. United States, 90 U.S.App.D.C. 2, 5, 193 F.2d 24, 27 (1951), cert. denied, 343 U.S. 908, 72 S.Ct. 639, 96 L.Ed. 1326 (1952), where the opinion recited:

"Two days later, May 8th, Tyler was interviewed in the jail by one

D.C. 233, 285 F.2d 675 (1960), cert. denied, 366 U.S. 941, 81 S.Ct. 1666, 6 L.Ed. 2d 852 (1961).

Gilkey in the course of Gilkey's duties as supervisor of classification at the institution. Gilkey asked Tyler about the charge upon which he was committed. Whereupon, Tyler repeated in substance the written confession he had made the previous Saturday to Detective Furr at police headquarters. In so testifying Gilkey's recollection was refreshed by a memorandum he had made during the interview."

This court then said, in effect, whatever question there might have been as to the admissibility of the confession before Tyler had been brought before the Commissioner where he received "judicial caution," the admissibility of Tyler's statement to Gilkey was not questioned. "Indeed, that would be quite impossible as to those statements made by him at the Commissioner's and the jail." 90 U.S.App.D.C. at 9, 193 F.2d at 31.

At the second trial following a hearing on the admissibility of that testimony by the jail classification officer, Judge Curran prepared an opinion which appears as United States v. Killough, 218 F.Supp. 339 (D.D.C.1963). His findings and his conclusions led to his ruling that Killough's further confession to the classification intern might be received in evidence. He agreed thus with Judge Youngdahl who had found at the first trial that Killough's later statements were independent and voluntary. Of course it had become obvious that Killough wanted to talk about the episode. He carried around and exhibited—perhaps proudly—clippings from the newspapers which had detailed his crime. He later narrated the circumstances to a nurse.

Meanwhile, following our opinion of October 4, 1962, our judgment of remand reached the District Court on November 26, 1962. On December 11, 1962, Killough was released on bail. Two days later he married Miss Holmes. When called as a witness at the second trial, she asserted her privilege as his wife and *her* lips were sealed. Talk about fruits of wrongdoing! This case has reached the nadir. As in Mitchell v. United States, 78 U.S.App.D.C. 171, 138 F.2d 426 (1943), once again, this court has painted itself into a corner.[3]

Since I would affirm Killough's conviction, it goes without saying that I agree with so much of Part III of Judge Washington's opinion as holds admissible the testimony of the nurse and the evidence relating to the victim's body.

---

3. See generally, *Coerced Confessions*, 31 U.Chi.L.Rev. 313, 326–27 (1964).