**STATE of Missouri, Respondent,**

v.

**Paul Albert WOOD, Appellant.**

No. 37036.

Missouri Court of Appeals,
St. Louis District.

Nov. 8, 1977.

Motion for Rehearing and/or Transfer
Denied Dec. 16, 1977.

Application to Transfer Denied
Jan. 9, 1978.*

* Rendlen, J., not participating.

Lester W. Duggan, Jr., St. Charles, for appellant.

John C. Danforth, Atty. Gen., Preston Dean, W. Mitchell Elliott, Asst. Attys. Gen., Jefferson City, Keith M. Sutherland, Pros. Atty., Warren County, Warrenton, for respondent.

ALBERT L. RENDLEN, Special Judge.

Paul Albert Wood, Jr. appeals his conviction of murder in the first degree for which he was sentenced to life imprisonment. As grounds for reversal, defendant contends the trial court erred: (1) by admitting evidence of defendant's statement (confession) made following a warrantless, unlawful arrest in violation of defendant's rights to remain silent and to assistance of counsel, (2) by admission of evidence obtained as the result of the unlawfully procured statement, (3) in failing to impose sanctions for the state's refusal to comply with discovery rules, (4) by improperly proceeding with a panel of only twenty-four veniremen and (5) because the evidence, absent testimony of defendant's confession and evidence procured thereby, was insufficient for submission. We reverse and remand.

Barbara Crabtree, employed at the J. C. Penney store in Washington, Missouri, on July 30, 1974 left for lunch and without explanation failed to return. That afternoon a slip of paper bearing defendant's St. Louis address and phone number was inexplicably found pinned to Mrs. Crabtree's key hanging from her locker at the Penney store. Two and one-half days after her disappearance, at about 7:20 p. m. on August 1, Deputy Sheriff Cope of Warren County was summoned to a location just north of the Highway 47 Missouri River bridge in the southern part of the county. Going there with information that two men would be waiting and that a body had been discovered, Cope found defendant with a Mr. Schwartz,[1] at the entrance of a roadway leading from the main highway. Defendant led him on foot to a nearby wooded area where he was shown the deteriorating body of Barbara Crabtree with a red string type nylon cord tied around her neck.

■ Calling for assistance, Cope was joined by officers of the Warren County Sheriff's Office and the Missouri Highway Patrol. Shortly after arriving at the scene another officer, Lt. Malone of the Washington, Missouri Police Department, gave Cope the hand written "note" from Barbara Crabtree's locker with defendant's name and address.[2] Possessed of the note and knowledge concerning its significance, Cope confronted Wood with this information and inquired if he had previously known or seen the victim. At first Wood denied having known her and then stated he had not seen her for several years. Acting on these facts, Deputy Cope arrested defendant "for investigation of murder." We find such facts, together with the reasonable inferences therefrom, were sufficient "to warrant a man of reasonable caution in the belief that an offense [had] been or is being committed," *State v. Wiley*, 522 S.W.2d 281 (Mo. banc 1975), and that the person to be arrested was the offender. *Carroll v. United States*, 267 U.S. 132, 161, 45 S.Ct. 280, 69 L.Ed. 543 (1925). See also *Brinegar v. United States*, 338 U.S. 160, 175, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). The evidence sufficiently supported the trial court's determination of probable cause for the arrest.

Immediately following the arrest Cope gave the prescribed *Miranda* warnings. Thereafter, assisted by other officers arriv-

---

1. Defendant had hailed Schwartz, a passing motorist, on Highway 47, told him he had found a body and took him to the place where it was located.

2. Defendant points to testimonial inconsistencies contending that Malone could not have arrived with the "note" until after the arrest and thus the arrest was without probable cause. However, there was substantial evidence that Cope had received the "note" prior to the arrest.

ing during the night, Cope interrogated defendant at the scene until about 2:45 the following morning, when he and Sgt. Petruss of the State Highway Patrol took defendant to the Warren County jail. About the same time defendant's automobile was towed from the scene to the jail in Warrenton. Petruss and Cope continued the interrogation as defendant had made no admissions expressly involving himself in the crime. At approximately 3:10 a. m. they handed Wood a typed form (later state's exhibit # 2) containing a written waiver of his rights to remain silent or to have an attorney and by which he would have agreed to further questioning. Reading the form, defendant apparently had second thoughts concerning further interrogation without counsel. He refused to sign the waiver and instead initialed the form and wrote the word "refused" near his initials. In addition, defendant stated he was unwilling to answer further questions until he had an attorney. The officers, ignoring his protestations, continued the questioning. Testimony, developed in the hearing on the motion to suppress concerning the continuing interrogation at the Warren County jail, was as follows:

"Q. *And then someone asked him some questions after he refused to waive his rights?*

A. *Yes, sir.*

Q. Who was that?

A. *Sgt. Mudd and Sgt. Wheeler and Sheriff Twiehaus.* [Sgts. Mudd and Wheeler were members of the Highway Patrol who had arrived and Sheriff Twiehaus was the Sheriff of Warren County.]

Q. And were they all present in one room at the time they were asking him these questions?

A. We have a divided office there, but we were all within sight of each other.

Q. Was this upstairs?

A. No, sir, downstairs.

Q. Downstairs, all right. Then how long did this questioning go on there in the vicinity of 3:15 a. m.?

A. Just a very short time because he refused to answer.

Q. All right. *But the questions were continued to be asked of him?*

A. *Yes—uh-huh.*

Q. *About the crime?*

A. *Yes, sir.*

Q. Is that correct?

A. Yes, sir.

Q. All right. And he continued to refuse to answer those questions?

A. Yes, sir." (Emphasis supplied.)

Later the questioning ceased and at about 4:00 a. m., either Sgt. Mudd or the Sheriff resumed conversation with defendant, requesting that he sign written consent forms to search his car and home. He did so at 4:10 a. m. An immediate search of defendant's car produced nothing except a brown paper sack containing a sandwich and a bag of Doritos, not shown to be connected with the crime. About 8:00 a. m. officers searched his room in St. Louis, but no incriminating evidence was discovered. Sometime near 4:15 a. m. defendant was put in a cell, remaining there until 7:00 a. m. During that period he may have slept briefly. However, he was dressed and awake at 6:55 a. m. when Deputy Cope returned to take him from the Warren County jail to the Missouri Highway Patrol Troop C Headquarters at Kirkwood for further interrogation. Cope, when testifying to these matters, was not sure if defendant had undressed or slept at any time during the night, but stated the only food or drink given defendant during this period was a candy bar and possibly a Coke or some coffee.

Wood was delivered to Troop C Headquarters at about 8:00 a. m. and, after a wait in the lobby under guard, was placed in a holdover cell until approximately 11:00 a. m. Sometime during the morning, he was taken to a room "where he had agreed to take a polygraph test." An armed lieutenant of the Highway Patrol conducted a polygraph examination while three armed officers waited outside the room. Before the polygraph was given, *Miranda* or similar warnings were again read and though defendant submitted to the examination he denied connection with the crime. At the

conclusion of the polygraph Sgt. Mudd continued the interrogation and sometime between noon and 1:00 p. m. Mudd told defendant he had better "come clean" because the officers had other evidence. At that time, seventeen hours after questioning began, appellant signed a pretyped form waiving his rights to counsel and to remain silent. Three and one-half hours of questioning by Mudd and Sheriff Twiehaus followed, during which defendant confessed the crime. The statement was dictated, typed, and put before defendant who read and signed it. The statement contains a detailed confession of his guilt in the strangulation death of Barbara Crabtree.

Later that day, Sgt. Mudd and Sheriff Twiehaus, with new information obtained from defendant during the "confession," returned to defendant's residence and found the victim's purse in a trunk in the basement and a thermos bottle, having the appearance of one owned by the victim, in a kitchen cupboard.

On Sunday, August 4, Twiehaus and Mudd took Wood to the place of the crime and he directed them to a beer can containing the victim's necklace not far from where the body was found. The next day defendant requested and was allowed to speak to the prosecuting attorney of Warren County and was again given a waiver to sign in the same form as that submitted to him at 3:15 a. m. on August 2, except that of August 5 contained an additional statement that Wood had been "advised of the above rights prior to making my statement on August 2, 1974, at 2:00 p. m. at Troop C Headquarters, Kirkwood, Missouri."

Overruling defendant's motion to suppress, the trial court found the confession was not taken in deprivation of any constitutional right and the items obtained from defendant's car and residence were products of permissible searches performed with the voluntary consent of defendant. Defendant contends his confession was obtained in violation of his rights under the Missouri Constitution, Art. I, §§ 15, 18(a) and 19, and of amendments IV, V, VI and XIV of the United States Constitution and particularly his rights to remain silent following arrest and for assistance of counsel. He points to the interpretation of the Fifth Amendment to the United States Constitution in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), as the same has found application in Missouri by *State v. Stevenson,* 523 S.W.2d 349 (Mo. App.1975).

We conclude that defendant submitted voluntarily to interrogation from 7:20 on the evening of July 30 until 3:15 the following morning. At that time he refused to further waive his rights and evidenced this refusal in writing on the proffered waiver form. Witnesses for the state admitted defendant refused to answer further questions until he had an attorney. By these acts, defendant asserted his Fifth Amendment right to remain silent and his right to counsel under the Sixth Amendment. Nevertheless the officers continued as though reading *Miranda* warnings to defendant was license for incessant interrogation without regard to his protestations and asserted right to cut off further questioning. The officers here, as in *Stevenson, supra,* "failed to respect defendant's exercise of his rights."

The United States Supreme Court in *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), examining the question of admissibility of inculpatory custodial statements of the accused, commented that as to a person who is warned of his *right* and indicates a desire to remain silent, *Miranda* does not provide a *"per se* proscription of indefinite duration upon any further questioning by any police officer on any subject . . ." [l.c. 102–103, 96 S.Ct. 326] The court however, in further explanation of *Miranda* stated the critical safeguard was a person's "right to cut off questioning," concluding that the admissibility of statements obtained after one in custody has decided to remain silent depends, under *Miranda,* on whether his "right to cut off questioning was 'scrupulously honored.'" [l.c. 104, 96 S.Ct. 326]

From this record we cannot find that Wood's rights were so honored; in-

deed, when he asserted his rights to remain silent and for an attorney, the questioning continued until he simply refused to answer further. The questioning resumed in various places by various officers until he confessed the following afternoon. The Highway Patrol personnel who conducted the polygraph and continued the interrogation on the second day were aided by the continuing effect of the prior in-custody interrogation. In *Mosley, supra,* the court condoned as constitutionally permissible a resumption of interrogation following a two hour cessation of questioning, cut off in the first instance by the accused's statement, "that he did not want to discuss the robberies." The earlier interrogation death with a robbery, the later concerned an unrelated murder. The court distinguished the procedural safeguards triggered by a request to remain silent and a request for an attorney. Interpreting *Miranda,* the *Mosley* court stated " 'The interrogation must cease until an attorney is present' only '[i]f the individual states he wants an attorney.' " Here, Deputy Cope, who conducted the interrogation for the first seven and one-half to eight hours, testified that defendant, at about 3:10 a. m. on the morning of August 1, refused to sign the proffered "waiver" form and refused to answer further questions "until he had the right of an attorney." The testimony concerning these matters follows:

"Q. I now hand you what has been marked State's Exhibit No. 2 and ask you to take a look at that and tell the Court what that is.

A. This is the statement that was initialed by Mr. Wood.

Q. Whose signature appears at the bottom?

A. Sgt. W. R. Petruss and Clifford W. Cope.

Q. And did anybody else sign that form?

A. It was *initialed* by Mr. Wood *on a refusal* to sign it.

Q. What did he refuse to do?

A. *He refused to answer any questions until he had the right of an attorney.*" (Emphasis supplied.)

On cross-examination, these matters were reiterated:

"Q. Okay. And on that exhibit there, you have indicated to us that Mr. Wood indicated that he refused to sign that.

A. Yes, sir.

Q. Is that correct?

A. Yes, sir.

Q. And also indicated that he refused to waive his rights, is that not right?

A. Yes, sir.

Q. And he also told you, as I remember your testimony just a few minutes ago, *he told you that he didn't want to say anything; he didn't want to answer any questions until he had an attorney.* Isn't that what you just said a little while ago?

A. No, sir.

Q. Tell me what you—*I have got a note here that you said he refused to answer questions until he had an attorney.*

A. *That was after he signed this* [Exhibit No. 2]; *after we were back in our office, yes, sir.*

Q. Okay. And that was at 3:10 in the morning.

A. Yes, sir." (Emphasis supplied.)

The violation of his rights to cut off questioning under the Fifth Amendment and to assistance of counsel guaranteed to him by the Sixth and Fourteenth Amendments rendered Wood's statements made thereafter inadmissible. The state, however, in essence argues that defendant waived his right to remain silent and in fact did not expressly request counsel, or if so, similarly waived such right. The record negates the contention.

■ The proper standard in determining the question of waiver requires the state to prove "an intentional relinquishment or abandonment of a known right or privilege," *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), and the courts must indulge every reasonable presumption against such waiver of Fifth and Sixth Amendment rights.

Pertinent to this discussion is the comment in Mr. Justice White's opinion, concurring in result, in *Michigan v. Mosley,* 423 U.S. 96, 110 n.2, 96 S.Ct. 321, 329, 46 L.Ed.2d 313 (1975), "the accused having expressed his own view that he is not competent to deal with the authorities without legal advice, a later decision at the authorities' insistence to make a statement without counsel's presence may properly be viewed with skepticism." See also *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977).

■ Defendant's request to cut off questioning until he had an attorney, at 3:15 a. m., was less than scrupulously honored. Instead it was followed by about twelve more hours of persistent questioning with little or no sleep or food for defendant, broken only by brief intervals for travel and about one-half hour respite when defendant simply would not answer further. All this goes contrary to the state's contention and the continual custodial coercion vitiated the claim of voluntary waiver. The subsequent *Miranda* warnings and waiver forms executed by defendant must be said to have resulted from the seemingly interminable interrogation after defendant realized his requests to terminate questioning and for assistance of counsel were to no avail. Because defendant's statement or confession and related testimony were improperly admitted in evidence, the cause must be reversed.[3] We are unable to conclude on the record before us that the state may not be able to adduce additional evidence at another trial and accordingly the cause is remanded for new trial. *State v. Wade,* 531 S.W.2d 726 (Mo.banc 1976). Defendant's other contentions of error need not be

reached as such matters are unlikely to recur in subsequent proceedings.

The cause is reversed and remanded for new trial.

McMILLIAN, P. J., and STEWART, J., concur.

---

3. On retrial evidence found in defendant's car and house might well be admissible on the theory that such evidence would have been discovered in any event, even had the incriminating statement not been elicited from Wood. See *Killough v. United States,* 119 U.S.App. D.C. 10, 336 F.2d 929 (1964), cited in *Brewer v. Williams, supra,* 430 U.S. at 406, 97 S.Ct. 1232. As guidance to the trial court concerning the questions (1) whether a person in custody can give voluntary consent to search, (2) whether such consent is a statement obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and (3) whether evidence obtained as a result of the search was "fruit" of the illegally obtained statement and hence inadmissible under *Wong Sun v. United States,* 371 U.S. 471, 484–86, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), we direct attention to *United States v. Lemon,* 550 F.2d 467 (9 Cir. 1977). See also *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *State v. Rush,* 497 S.W.2d 213 (Mo. App.1973); *State v. Berry,* 526 S.W.2d 92 (Mo. App.1975).