**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Mark Charles GLEAR,
Defendant-Appellant.**

No. 47510.

Missouri Court of Appeals,
Eastern District,
Division Four.

June 25, 1985.

Motion for Rehearing and/or Transfer
Denied
Aug. 28, 1985.

Application to Transfer Denied
Oct. 16, 1985.

Timothy A. Braun, St. Charles, for defendant-appellant.

John Munson Morris, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

SMITH, Presiding Judge.

Sometime during the night of January 15–16, 1980, Patricia Modglin was stabbed to death in her apartment. After 28 months of a "frustrating" investigation defendant Mark Glear, an alcoholic transvestite, was arrested on May 19, 1982, on burglary charges. During a ten hour period following the arrest he gave three statements, an oral, a written, and an oral admitting that he killed Ms. Modglin. In December 1982 he was charged with capital murder and following trial was convicted of manslaughter with punishment assessed at ten years imprisonment. He appeals.

On appeal he raises as error primarily the failure of the trial court to suppress the three statements. Based upon the claimed inadmissibility of those statements he further asserts that he is entitled to a judgment of acquittal. The state has conceded that in the absence of any of the statements there is insufficient evidence to support the conviction.

The victim was stabbed three times in the neck area. This apparently occurred in her living room and she either moved to the bedroom or was taken there. Death occurred very shortly after the stabbings. A fire was set in the bedroom, either on the victim or in close proximity to her body and she sustained severe burns to her body. She was dead when the fire was started. Both entrances to her apartment were locked when the firemen, who discovered her body, arrived. Her Ford Maverick automobile, parked near the rear patio door of the apartment, was taken and subsequently found on fire some distance from the apartment. The fire had been set in the interior of the vehicle.

Putting aside defendant's admissions there was no evidence to establish his acquaintanceship with the victim or his presence in her apartment. Fingerprints found on a magazine used to drape the body belonged to the victim's son or as to one print were unidentified. A bloody print found on a wall was not the defendant's. It was covered with soot, indicating its presence prior to the fire. Hair fragments found on the victim's body did not match hair samples taken from defendant. There were bloody footprints of stocking-clad feet found on the kitchen tiles which bore a distinctive foot pattern. Police took impressions of defendant's feet but no evidence was introduced that the prints on the tile were made by defendant.

In the afternoon and evening of May 18, 1982, defendant was drinking heavily. By nine o'clock that evening he had fallen off a bar stool, fallen in the men's room of a bar damaging a towel rack, and had been refused further service by a barmaid because he was too intoxicated. She described defendant as more intoxicated than anyone she had ever seen. After leaving the bar defendant fell off a wall and police were summoned. They took defendant and his bicycle to his grandmother's house where they left him. The police testimony minimized the extent of defendant's intoxication at that time.

Around midnight defendant was arrested as a burglary suspect. The suspicion involved a series of break-ins in which women's lingerie was stolen. Defendant was orally given his *Miranda* warnings by patrolman Vollmar at the time of his arrest. He was taken to the police station where the rights were repeated and where he was asked to initial the rights form. He initialed two lines of the rights form dealing with his right to remain silent and that any statement would be used against him. He did not initial the remaining blanks on the rights form although he did sign a line at the bottom of the form. The police testified that the absence of further initials was because defendant felt it was unnecessary as he understood his rights. Defendant testified that it was because he was so drunk he could not sign and because he did not wish to waive his rights. The initials he did affix and his signature are an unreadable scrawl and in great contrast to the compact and precise initials and signature he affixed to a subsequent form 10 hours later. On the original form he wrote only "Mc" of his residence address of "McDonough." All of the officers involved with defendant after his arrest testified that he had been drinking but was not severely intoxicated. One officer stated that if defendant had been stopped for a traffic violation the officer would have required a breathalyzer test. In his police report concerning defendant's arrest, Officer Vollmar stated he had given defendant his rights and "the subject would make no statement to this officer concerning the burglaries." The officer explained this at the suppression hearing as meaning that he, the officer, did not want to talk to defendant about the burglaries.

While defendant was waiting in the hall of the police station he asked Officer Penrose if he could put on a woman's slip which he was carrying in his pocket at the time of his arrest. The officer allowed him to put the slip on over his trousers. While waiting with Penrose, defendant opined that he was in need of medical assistance for his alcoholism and transvestism. During the time that defendant was wearing the slip, Sgt. Tullock entered the police station. He made some comment on Mark being in trouble. Defendant was questioned about the burglaries for approximately an hour by Penrose. Then Tullock had Mark brought to him for questioning concerning the Modglin murder. Tullock determined that defendant had been given his rights and they were not repeated. Tullock had not had prior substantial involvement in the Modglin murder investigation.

Tullock questioned defendant for approximately three hours. Initially defendant denied having anything to do with the Modglin murder. Tullock then stated that it appeared that defendant's fingerprints matched those found in the apartment. This statement was admittedly untrue as was a subsequent one about a slip missing from the apartment. Through the next several hours, utilizing at least in part leading questions, Tullock elicited from defendant an involvement in the murder. The thrust of the story was that defendant met the victim at a bar, had some drinks with her, and accompanied her home. In the apartment defendant and victim disagreed on the nature of the sexual activity in which they would engage, he struck the victim, lit a fire in the bedroom, took the victim's car keys, left through the patio doors, took the victim's car, drove some distance and left the car after setting it on fire. No notes of the interrogation of defendant were made during the interrogation by either officer present, no audio tape recording was made, and no video tape recording was made. The absence of recordings was explained as not being department policy and because getting access to the equipment would have required waking up a higher ranking officer. Erhard, the officer who witnessed the oral statement prepared his written report a year later, one week before trial, relying solely on memory.

At the conclusion of the oral statement, defendant was asked if he would give a written statement. His answer was either that he would not until he received medical

help or that he would after he had seen a doctor, depending on which police officer's testimony is credited. Tullock answered "Yes" when asked if defendant refused to give a written statement. On at least three occasions Tullock testified that defendant stated he wished to see a lawyer during the initial interview. On each occasion when examined further Tullock stated he misspoke and meant to say that defendant wanted to see a doctor. Following defendant's statement about giving a written statement Tullock terminated the interview.

Approximately 45 minutes after the termination of the interview, Tullock sent another officer to get the defendant from the holdover cell. When he was further interrogated by Tullock, defendant gave the written statement he also seeks to suppress. Tullock testified that *Miranda* rights were read to defendant prior to this statement and at the beginning of each new page even when that beginning was in the middle of a sentence. Tullock typed the statement which defendant dictated. When completed, defendant initialed corrections and signed each page of the statement. That statement largely paralleled the prior oral statement except it contained defendant's admission he stabbed the victim and differed from the original oral statement in some details.

Defendant was returned to his cell. Approximately four hours later two different officers interrogated defendant after giving new *Miranda* warnings. They took no notes, and made no recordings of the interrogation. Their explanation for the absence of recordings was department practice and because they did not know whether defendant was telling the truth. They prepared their report of the interrogation that day or the next day from memory.

Prior investigation of the crime had conclusively established that the victim arrived home on the night of the murder unaccom-panied by anyone. The oral statement testified to by the final two officers was that defendant was in the apartment house trying doors, he opened the unlocked door of the victim's apartment, the victim was asleep on a couch, defendant put on one of her negligees, defendant began fondling her breasts and masturbating, the victim awoke, defendant stabbed her, defendant ate a sandwich, drank a beer, took a shower, lit a fire in her bedroom, exited from the patio door, drove away in her car, and set it on fire. At the end of the statement, defendant denied having committed the crime or being there. It is sufficient to say that each of the three statements of defendant were partially corroborated by physical evidence at the crime scene. It is also necessary to say that much in the statements was contradicted by physical evidence or that the statements did not explain much of the physical evidence and indicated defendant's apparent ignorance of matters which the killer presumably would have known. The three statements also contained many inconsistencies as to each other. Some of the statements of ignorance made by defendant to Tullock were omitted from Tullock's report of the oral statement and from the written statement.

Defendant testified that he was too intoxicated to knowingly waive his rights, that he did not want to waive his rights, that he repeatedly asked for an attorney during his initial interview with Tullock, that no attorney was furnished, and that the interrogation continued despite his request for legal and medical help. Defendant denied killing the victim and explained the statements as the product of intoxication, embarrassment, depression, tiredness,[1] a desire to be let alone, and because he thought if he admitted guilt he would be able to see a doctor. He also stated he believed the police were joking. He presented evidence of alibi and the identity of possible culprits. He also produced evi-

1. The only evidence in the record indicates defendant had had no sleep since 7:00 a.m. May 18. The only evidence as to whether he slept between 6:30 and 9:15 a.m. May 19, at which time he was offered and refused food, was defendant's testimony that at some time he got 15 minutes sleep.

dence that a man, not the defendant, was seen in close proximity to the victim's car immediately before the fire in the vehicle was discovered, and evidence that the vehicle had been seen in the same parking area where it was abandoned on several prior occasions.

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444, 86 S.Ct. at 1612. The state must establish that defendant was effectively advised of his rights and that he intelligently and knowingly declined to exercise them. *State v. Christian*, 604 S.W.2d 758 (Mo. App.1980) [2–4]. The proper standard in determining whether a suspect has waived his rights is to require the state to prove an intentional relinquishment of a known right or privilege. *State v. Wood*, 559 S.W.2d 268 (Mo.App.1977) [3–4]. In *Miranda* the court "further held [that] if an interrogation continues without the presence of an attorney and a statement is taken, the State has a heavy burden to demonstrate the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to counsel." *State v. Stevenson*, 523 S.W.2d 349 (Mo.App.1975) l.c. 351. Courts are required to indulge every reasonable presumption against a waiver of the right against self-incrimination and the right to counsel. *State v. Wood, supra,* [3, 4]. The state therefore bears a heavy burden to establish waiver. Voluntariness of the confession is determined by considering all the relevant circumstances surrounding it. *State v. Christian, supra,* [2–4].

*Miranda* further articulated the procedures to be followed after warnings have been given. "If the individual indicates *in any manner, at any time prior to or during questioning,* that he wishes to remain silent, the interrogation must cease.... If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Miranda, supra,* 384 U.S. 474, 86 S.Ct. at 1628. (Emphasis supplied). In *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), it was recognized that an exercise of the right to remain silent does not in all circumstances under all conditions preclude subsequent questioning of the suspect if at the subsequent questioning he intelligently and effectively waives his rights. 423 U.S. 104, 96 S.Ct. at 326. But *Mosley* involved questioning on an unrelated crime after a prior invocation of the right to remain silent and that fact was highlighted by the court in finding an effective waiver. The court specifically distinguished *Mosley* from a case where the police "failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind." 423 U.S. 105–06, 96 S.Ct. at 327. And see *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

In our review we are under the same constraints as with any other review of a decision on disputed evidence by the trial judge. We must defer to the trial court's determination of credibility and factual determinations on the disputed testimony. Without those constraints we would find no effective waiver of either the right of silence or the right of counsel by defendant as to any of the statements.

Our examination of the waiver form first signed by defendant indicates to us an intoxication level sufficiently high to have almost totally eliminated defendant's hand coordination. Intoxication which is less than "mania" does not require suppression of a statement if the statement is made knowingly and intelligently. Intoxication goes to the weight and credibility of the statement. *State v. Wisdom*, 540 S.W.2d 94 (Mo.App.1976) [1, 2]. The same test is applied in determining whether the defendant is capable of knowingly and in-

telligently waiving his rights. *State v. Wisdom, supra; State v. Heather*, 498 S.W.2d 300 (Mo.App.1973) [5]. We have great difficulty placing credence in police testimony that a suspect incapable of more than a scrawl for a signature and incapable of completing his address was nevertheless sober enough to understand and intelligently waive his rights. But we defer to the trial court's implicit finding to the contrary on that point. We also view with great suspicion the testimony of an experienced police officer familiar with the *Miranda* doctrine that his statement in his police report that, "the subject would make no statement to this officer concerning the burglaries" meant the officer had asked no questions about the burglaries. This is particularly strange in view of the officer's previous actions in taking defendant to be identified by the burglary victims after arresting him and the description given throughout that defendant was "cooperative." The original statement in the police report would indicate refusal to waive the right to silence and because the record demonstrates no subsequent warnings prior to Tullock's questioning would vitiate the first oral confession. But we must again defer to the trial court's determination to credit the testimony of the officer. Finally we have difficulty accepting Tullock's explanation that his references to defendant requesting a "lawyer" were "misspeakes" particularly when some of them occurred after his attention had been called to his prior "misspeakes." But we defer to the trial court's finding that in fact no lawyer was requested. We, therefore hold that there was credible evidence, if the police are believed, that defendant was apprised of his rights and intelligently and knowingly waived them prior to the first oral statement. The trial court did not err in failing to suppress the first oral statement.

It is undisputed, however, that at the conclusion of that statement the defendant said he would make no written statement until he had seen a doctor. Such an expression is an exercise of his right to remain silent. Tullock so recognized it for he at that point "terminated" the interrogation. Yet less than an hour later he had defendant brought back for further interrogation and took the written statement. Such conduct does not demonstrate that defendant's right to cut off questioning was "scrupulously honored." *Michigan v. Mosley, supra*, 423 U.S. 104, 96 S.Ct. at 326. Bringing defendant back for further questioning, with or without further warnings, subjected him to the continuing compulsion of the custodial interrogation condemned by *Miranda*. *State v. Stevenson, supra*. Defendant did not voluntarily seek to continue the interrogation, he was asked by the police to continue the interrogation. The written statement should have been suppressed and its introduction into evidence was error.

The same is true of the subsequent oral statement. It was a continuation of an interrogation which defendant had sought to terminate. It dealt with the same crime as the interrogation by Tullock and was not the product of defendant's suggestion or volunteering. The officers conducting the interview consulted with Tullock prior to commencing the interrogation. It presents the very situation distinguished in *Mosley*, as impermissible. It is also distinguishable from *Oregon v. Elstad*, — U.S. —, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), holding that a voluntary unwarned statement in a non-coercive environment does not "taint" a subsequent statement made after full warnings and waiver. Defendant here never left the coercive atmosphere. Police are not allowed to deny a suspect his right to cut off questioning by continuing to press for statements after the right to silence has been invoked. The second oral statement should have been suppressed and its introduction into evidence was error.

The first oral statement was sufficient to support the conviction for manslaughter if believed. It was at least partially corroborated by other evidence. We therefore deny defendant's second point that the admissible evidence failed to make a case.

Judgment reversed and cause remanded for retrial on the charge of manslaughter.

SNYDER and SATZ, JJ., concur.